Good morning, Your Honors. May it please the Court. My name is Susan Lin. I represent Appellant Joseph Paul Berger. Could I please reserve three minutes for rebuttal? Sure. Thank you. Your Honors, this case involves whether the mere possession in the home, in a locked room, of automatic firearms and silencers by a Navy veteran with no prior... Are they automatic firearms or are they machine guns? Is there a distinction? It's the same thing. Fully automatic firearms are machine guns. And in this case, they were possessed within the home, and the question is whether or not that possession satisfies the two-step test set forth in Bruin for Second Amendment protection. Now, before I actually talk about Bruin and its application, I want to emphasize that this is an as-applied challenge. This is not... We're not bringing a facial challenge. We are only interested, I submit, in the particular facts of this particular case, in which the possession was entirely within the home, and it was mere possession. Now, with regards to the possession of automatic weapons, there are three points I want to address. One is that Palmetto State does not control here. It is a pre-Bruin case that is not controlling on this Court anymore. Two, that the question of whether an arm is in common use has no place in the first step of the Bruin analysis, which just focuses on the plain text. And three, that when it comes to historical regulations, the historical examples cited by the government all regulated dangerous and unusual weapons that were carried in public in a manner that terrified people. Okay, so let's take your argument. Let's assume that's right. Can people carry rocket-propelled grenade launchers? I know my 15-year-old son would love to have one. How about Javelin shoulder-launched missiles or Stingers? Does your argument entail that all of that can be done as long as it's in my son's bedroom? So the hypothetical, let's say, is in the home only, and it's possession in the home only. In the home, just in case an intruder comes, he wants to be really ready. So, one, I would suggest that we don't actually have to reach those examples here in this as-applied challenge, but if I had to, if somebody forced me to actually address the examples that you have raised, Judge, I would argue that one could potentially make the distinction that historically, when they talked about arms, they weren't talking about arms that could cause a wide range of destruction with a single firing. So they did not have in mind our founding fathers things like cannons or trebuchets, which I would say are the modern-day equivalents of rocket launchers or bombs. Where do we get that from as a matter of law? Where would we get that legal distinction that you're trying to draw? So, I would, there is a sense that arms means then what arms means now. And we have, in Justice Scalia's opinion in Heller, a description what arms are. It talks about things that could be worn, armors that could be worn for defense, things that could be carried in the hands. It also talks about, Justice Scalia talked about in his opinion, the idea that firearms constitute arms. I think that's as far as this court needs to go in this particular case. Okay, so we're in Philadelphia, Sylvester Stallone, the entire Rambo arsenal is permissible because he could carry the whole thing. Well, I don't know exactly what Rambo's arsenal was. He had bandoliers of bullets. He had rocket-propelled grenades. I can't remember if there's a flamethrower, but all those things, at least the young, built Sylvester Stallone could carry around. So, I think we need to go back to the actual text or the test that's set forth in Bruin. One is whether or not it falls into the text of the Second Amendment. And if it does, it doesn't mean that it's protected conduct under the Second Amendment. That only tells us whether or not we are in Second Amendment world. If it is in the plain text, then we still get to go to the historical regulation test and ask whether or not the Founding Fathers would have restricted historically. Okay, so your test is, it's an arm if you can carry it, but then the historical restrictions that matter aren't carry, those were only carrying restrictions. So, there's a little bit of gap between your two arguments here. I would say, I don't know that there's a gap. I would say that we look at the facts that we have at hand and we apply what the test says. And the test clearly says plain and ordinary meaning of the Second Amendment, right? Nothing in the text of the Second Amendment about common use. Nothing in the text of the Second Amendment about dangerous and unusual. All that comes in in the second test. Second test is, right, the historical regulations, whether or not it is consistent with our nation's history of historical tradition of firearm regulations to regulate something that is within the mere possession of something within a person's own home. Or whether or not that historical tradition was about public peace and public carry and causing terror to the public by using dangerous and unusual weapons. So, Sylvester Stallone is walking down Broad Street with all that stuff on him and he's like waving at people. No question about it. Historical tradition, that can be regulated. What would be prohibited at step one, if anything? Well, I think that the easy things are canon. The things that are the equivalent of canons, right, cause massive damage, typically thought of as things that you can't necessarily carry in your own hand. And these automatic weapons don't cause massive damage? So, the automatic weapons with a single shot fires a single bullet. The same as any other firearm, be it revolver, a semi-automatic, a semi-automatic with a bump stock. One pull, though. So, if it's a short enough pull, it's one bullet. Right. But your distinction is, you know, one action, one consequence. That's the difference between an automatic weapon and a semi-automatic weapon, is one pull can unleash mass destruction. Can it not? So, it's possible that one pull of a fully automatic weapon will fire multiple, yes. It can fire multiple bullets. As many as you've got in your magazine. If you hold it for long enough, yes. That is true. So, why isn't it dangerous under the definition that you've proposed? So, I want to back up and say the dangerous, when I was talking about canons, things that could cause damage to a large area, I was talking about step one. I wasn't necessarily saying that I would categorize those as dangerous. I was talking about whether those fit the concept of barrel ball arms as used in the plain text of the Second Amendment. So, a single pull of a machine gun's trigger or an automatic weapon's trigger can cause massive amounts of damage, correct? I would submit that any firearm can cause a massive amount of damage. There's a distinction between a handgun. A handgun? You pull the trigger once and you hold it down, it's going to shoot one bullet. You pull the trigger down on an automatic weapon or machine gun, it's going to cause massive damage. It can fire many bullets, and if aimed at many different people, yes, it could hurt many different people. The same can be said of any firearm. It can cause damage. The question of, if we're talking about, if we're trying to define dangerous and unusual, I think it's, I think the difficulty of that is it's such a vague term, dangerous and unusual. Going back to step one, what would be prohibited other than a cannon? In step one? Yeah. I mean, anything that I would think would fit the ilk of what a cannon does, which is causing damage to a large geographical area with one firing, with one deployment, I guess one could say. Let's say that we disagree with you, and we think this goes into what is covered at step one, and we have to ask the common lawful use. How do we tell, and what makes these in common lawful use? So I will pause here and say that I think the common use test is an incredibly unwieldy test for one to use. You want to resist the hypo, but let's say I insist upon the hypo. If we have to apply that test. If we have to apply the common use test, as far as it applies to machine guns, there are two ways to do it. You could do the pure numbers test, which is what some people do, or you could think of it more in terms of familiarity. Okay, pure numbers, how do these numbers stack up against other things? So pure numbers, I think there is, in the case law, ATF had published a survey in which there were, I want to say 700 some, court's indulgence, I can get the number for you, 740 legally registered machine guns as of 2021. Of that, there were probably about 176,000 that constituted the pre-1986 legally registered firearms, right? Machine guns, automatic weapons that were registered as of the date the ban took place. 176,000. 176,000. Now, you can compare that to Justice Alito's concurring opinion about the stun guns and Caetano, where he talked about how 200,000 stun guns made them in common use. That is one way to look at common use. Another way to look at common use, which is not necessarily about numbers, because I think numbers, if you rely on that, it gets into this weird circularity play between the courts and legislators and manufacturers, right? But let's look at familiarity instead. We think about how many people in our country have served in the military. There are about 18 million living veterans right now, according to a study by the Pew Charitable Trust Foundation. All of those individuals have familiarity with automatic firearms, machine guns, because they were trained in it when they were part of the military. Any adult who doesn't have a prior record can go to several shooting ranges in the state of Pennsylvania and rent a machine gun and shoot it there. These are not exotic weapons. So if we think of unusual in a slightly different way of familiarity in the general public, I would say that machine guns are not considered dangerous and unusual, and they can be considered in common use in that way. OK, what would you say about silencers and suppressors? So silencers and suppressors are a different analysis. Let me move on to that then. I think the parties now agree that silencers are considered arms under the Second Amendment and get past the presumptive protective stage of Bruin. But we're not bound by that. True. The court is not bound by that. I think there is reason. So can you make an argument for why it is? Sure. This court has actually held in a prior case that large capacity magazines are considered arms under the plain text of the Second Amendment because they are attached to the firearm and they allow the firearm to help the firearm to function. Silencers are the same thing. They get attached to the firearm. Is it the same? Because I could basically obliterate someone's Second Amendment right by saying, hey, you can have all the guns you want, but you can never own any bullets and you can never own any magazines. I mean, but if I say you can never have a silencer, that's not going to impair your ability to wield a firearm for your self-defense. The prior case by the circuit was about large capacity magazines. It wasn't about magazines in general. So one doesn't need a large capacity magazine in order to be able to fire the gun. One can load a single bullet into the gun and it would fire. One could load a magazine that only holds, I don't know, six bullets and it would fire. It's a category that has some nuances within it. But a magazine you have to have to work your firearm. A silencer, no matter how many silencers, and this isn't a ban, it's a registration, but no matter how many silencers, let's say I just outright ban them, no one's going to not have a functional firearm. If we're sticking to just the first step of Bruin, it's no longer just about whether or not it technically functions. It's about what's necessary in order for you to fully enjoy the right to be able to use your firearm in self-protection. And there are plenty of studies out there talking about how silencers are necessary to protect the hearing of the user. They make the use of the firearm more accurate. These were studies and articles that were- Is there anything on the record in the district court to support that argument? So they were proffered in the papers in the motion to dismiss. There was never any, I guess, contesting of that information. So there was no evidentiary hearing put on, but the facts that I'm referring to were referenced in the motion to dismiss before the district court. What you're saying sounds more like useful than necessary, but let's assume these are arms, and let's assume they're useful enough and everything. Still, this is just a registration requirement. As to the silencer-suppressor, what in the Second Amendment- I mean, we have case law that allows serial numbers, et cetera. How does that impair the right to keep and bear arms, just to say if you're going to have one of these registered? So the question isn't about how it impairs it. The question, if we're following Bruin, is whether or not these regulations, the requirement that it be registered, is consistent with the historical tradition. And the burden is on the government at that stage, at that particular step. And the regulations that have been proffered by the government were all regulations that were aimed at the transportation, the sales, maybe even the storage of gunpowder. But none of that reached something that somebody made on their own in their own home. There is something in this- But he manufactured this one himself? So silencers can be made from, and the silencers- Did your client proffer that he made this on his own and did not purchase it? So that was not proffered.  But the change of plea did describe these silencers as made from solvent traps and oil filters. And I would say that down below in the district court, the government never offered anything on Step 2 of Bruin as to silencers. So if there is any factual question, then the proper response from this court would be remanding it to the district court to have a hearing and to hash out any factual issues that may exist. What about with respect to Mr. Berger's machine guns? Do we remand that for a Step 2 analysis in the district court? So I think that the district court actually conducted the Step 2 analysis for machine guns. And so I think that that is right for this court to consider. What the district court did was it found that common use was part of Step 1. I disagree with that. That's all in my papers. But then the district court also said, assuming that common use was not part of Step 1, here is the historical analysis. I think it erred in conducting its historical analysis because it relied on a fray laws. And as we know, a fray laws are, as I said, addressed at public conduct, dangerous and unusual weapons, but public in a manner that terrorizes people. I want to emphasize here that this is a case that's about the home. And there is something different about having weapons for self-defense in the home. And if we talk about the Second Amendment as it can't be a second citizen right, it can't be a second class right, it has to be just as important as all the other rights that are set forth in our Bill of Rights, then maybe the court can even think about, you know, draw a comparison to some of the obscenity laws that came out. There's Stanley v. Georgia, the Supreme Court case from the 60s in which Thurgood Marshall said obscenity. Yes, we have prior cases saying obscenity is not covered by the First Amendment. But you know what? There's something about the home that's different. And so banning the mere possession. You're not going to wield a weapon in self-defense of your home if it destroys your home at the same time. Flamethrower, grenade launcher, machine gun with single pull of the trigger. Right. So I do not concede. I would say that it is possible to use a machine gun in self-defense. What about 13 machine guns? There are collectors out there. There are people who take weapons to firing ranges. It is all in the home. The question is whether or not that is a place where historically the government has tried to regulate the possession of things that can be used in self-defense. Should we be analyzing it that way or as an as applied challenge? This is not this conduct, you know, on a motion to dismiss. Is this that this is amenable to that kind of analysis? Well, the kind of analysis I'm talking about here is the mere possession and the privacy of one's home. That is the facts in this case. And so I'm not talking about actually firing it. I'm not talking about wielding it or carrying it in the public. This really is the possession of one's home. It's not not in an urban area with lots of people where if you fire something, it might go through the wall and hit somebody else. We're not even talking about the firing of it. We're just talking about the possession of it, which is, you know, it is. It is analogous to what the court in San Diego, Georgia, was talking about when we talk about the mere possession of things in one's own home. Regarding the analogs for the registration, you mentioned sales or transport. But if you look at the proving laws and some of the marking laws, those are aimed at sort of like a quality assurance safety type thing. It does not seem to. Well, it it mostly reached manufacturers of, say, shoddy gunpowder or perhaps barrels that were too weak. If you had a homemade weapon or homemade gunpowder under those early laws, you still presented them for those same safety reasons. Is this not a safety measure? So that not an analogous why? I think it's a different kind of safety measure. But the government has thought different. How? But the same why? No, it's different. Why? OK. And it's sort of a different how as well. But let me go back to the why. What the government proffered in their filings was that the registration of silencers is appropriate because you don't know whose hands those silencers are going to fall into. Criminals can use them. That's not the why of the historical regulations that Judge Chung Yu just referenced. The why of those is to make sure that the quality of them is such that it's not going to cause harm to other people because the barrel of the firearm explodes. One, that's just not a concern with silencers. Silencers in and of themselves don't contain gunpowder. They can't explode. Two, it's not about making sure that nobody's selling a faulty product to somebody else because in this case, Mr. Berger made them in his own home for himself. And then finally, the why doesn't match. Right. The why of the government's regulation here when it comes to registering silencers is not the same as the why of the quality assurance regulations of the founding era. Any other questions? Thank you. Good morning, Mr. Zasma. Good morning, Your Honor. May it please the court. Robert Zasma on behalf of the government. Let me just start really quickly with a factual point. Judge Bibas, in response to your question, there were 12 silencers that were recovered here and that were charged. Three of them were imported from China. That's what led to this investigation when those were found. And then nine appear to be homemade. They're made out of oil filters of some kind. That's on the record. That is in the record. Page 83 of the appendix is one of the government filings that references these facts. The now the National Firearm Act does apply to homemade weapons and silencers. It really doesn't matter if you decide to go down in your basement and make a silencer. You have to register it and you have to have a background check and you have to pay a tax, at least until the end of this year, at which time the tax will expire. But the registration requirement will remain. Can you address Ms. Lynn's point about the mismatch between the whys? Yes, Your Honor. There is no mismatch. There is an endless tradition in this country of registration and background checks and regulation of firearms because they are dangerous objects. The Supreme Court in Heller and again mentioning it in Bruin made very clear that there's nothing about the Supreme Court's precedent in this area that calls ordinary restrictions like that into question. But the only registration laws that you cite were 150 years before. And then the post-founding laws you cite are proving laws. So I'm just talking about the registering and recording. Those were all I think the most recent one was 1652 that you cited. And you cite an 1810 proving law, which is not about recording, it's just about presenting for safety reasons, consumer safety reasons. And then 1835 and 1848 taxes on sales is one, which would not seem to be the government making a record of what an individual owns. And then in 1848, tax on possession or use, which I don't know, it's not apparent from reading the face of that, that it requires recording or registering. I mean, that doesn't seem like an incontrovertible tradition of registering firearms. We cite examples, Your Honor, and we can give more briefing on this if you want because the historical record is sort of endless, of registration requirements that go back centuries. There were examples in state and colonial law where the person rode into town with their weapons and was required to register the fact that he came in and what weapons he had at that time. The reason for it is very clear, which is there is a safety issue and there is a public interest. Even if the reason for it is just the safety of it is the fact of whether it is properly built and at large. Well, safety at large in the sense of not just using it for an unlawful purpose, which we do maintain is a valid reason for this restriction, but also that it's properly made and it's not harmful and it's not going to cause harm. That's the historical record that Your Honor is focused on. And it also supports the registration of firearms to make certain that people are going to both sort of safety writ large, although different aspects of safety there are relevantly similar. Absolutely. And it's and again, the Supreme Court has never called into question the ability of the government to oversee commerce in firearms. And I say firearms in a broad sense, which would include silencers to regulate commerce in firearms to make sure that everything is being done in a proper, safe manner, given the danger that any firearm presents. And so what we're left with on the silencer side, I'll get back to machine guns, of course. But with respect to silencers, Ms. Lynn is correct that the government recognizes that these are accessories that are protected by the Second Amendment. But this is a very ordinary standard restriction of registration. I mean, the brief you provided from Deborba, if I'm saying that right, doesn't cite a single law for the history and tradition it purports exists and makes a very means and type argument. And it says the burden is minimal in comparison to the legitimate government interest and sort of, as we all know, a framework that has been cast aside by Bruin, but then tries to sort of jam it in as a history and tradition of regular. I mean, that's sort of like saying our prior case law. Which used means and established the traditions. I'm not Dr. Borba brief. I don't know. How does it help you in any way, since it doesn't say any law at all for the history of reports and then basically makes means and arguments that brief runner states the current position of the United States, which is that. So it's making means and arguments. I don't know. I don't agree. The means and analysis was a second. The Bruin knocked that out as the second step of the analysis. What the government focused on and reevaluating its position regarding silencers is the simple question, which is not the means and question. The simple question of is this quote arms that is protected by the text of the Second Amendment. Your honor is corrected that the brief does not cite precedent on this because precedent precedent of this court pushed in the other direction. That's why we took the position we did before, until our superiors reevaluated it and instructed us that no they take a different view that accessories that are functional and useful, and that aid in the use of firearms are also arms. So I don't have authority to cite to you because this is a new position, but it's a reason position that the government has taken and that we suggest you isn't based on history and tradition. It's it's based on the definition again of the term arms, which includes items that are functional and that aid in the use of arms. It is different than it is. It's not essential. So your honor is absolutely correct that bullets are essential and ammunition is covered by the Second Amendment. These are items that aid the function of weapons and it is now the position of the government that that's included within the term arms as well. That's purely a first stage analysis as the meaning of the Second Amendment. We then get to the second stage we're not referring to means and we're simply saying, is it within the historical tradition of firearm regulation to have these ordinary registration requirements with respect to silencers or any other firearm. And our answer is that yes it does. And that's why in the end, I suppose, this court does not have to determine whether we're right or not about that first stage position that the government is now taking, because the ultimate answer is the same. And I would also disagree with my friend, Ms. Lynn, that there's any need for a remand here. The question of the historical tradition is one of historical fact. It's not a fact. There are no factual disputes in this case as to what Mr. Berger did and what he had. And therefore, it's easily a decision that this court can reach based on its own precedent and based on what we cited. What about the machine guns? So is there a distinction from the government's perspective between a machine gun and automatic weapon, Mr. Zassner, or is it one and the same? They are one and the same. The definition in the statute in Title 26 that's included in Title 18 is a weapon that's been adjusted so that it can automatically fire with one pull of the trigger. An automatic weapon is a machine gun and it is an unusual and dangerous weapon. This is not a difficult matter, I would respectfully submit. The Supreme Court in Heller said, we therefore read Miller to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns. I also want to push back on this idea that Heller is dictum with respect to machine guns. It is not dictum. Justice Scalia, for very good reason, goes on for pages in Heller to discuss this concept of unusual and dangerous weapons and specifically discusses at length machine guns. And the reason it's necessary in the Heller case is that the question in Heller are handguns. It's a ban basically on handgun possession in the District of Columbia. And what Heller needed to do to reach its decision is distinguish Miller. Miller is the case that says sawed-off shotgun, not used by the militia, not protected by the Second Amendment. It was essential to the Heller decision to mark the scope of the Second Amendment. And it did over and over again in saying that it does not reach unusual, dangerous weapons, weapons that were not in common use at the time of the founding. But common use, your friend raises this point. I mean, we have hundreds of thousands of these things out there. How do we figure out what's in common use? So, Your Honor, the Supreme Court spoke to that point in Heller that the idea of common use is not going to change over time if somebody decides to flood the market with incredibly dangerous weapons. What common use refers to is what a militiaman, and I'm sorry for the sexist reference here, but that's what the historical record refers to, of what a militiaman would have in his home in 1791 to protect his home and protect his property, and would then take with him in order to serve in the militia when called up. That's the definition of common use that the Supreme Court tells us. And they tell us that what was in common use and what that refers to clearly are muskets and flintlocks and the things that people had back then, which excludes unusual and dangerous weapons. At that time, it excluded the cannon. And I don't think anybody can reasonably dispute that the modern version of a cannon includes a machine gun that can wipe out a wide area of people or a rocket launcher or the other things that Your Honor referred to that Rambo might employ. And so that's what common use is, and that's why Justice Scalia and Heller said, using his word, it would be startling if the Second Amendment were read to protect machine guns. It simply doesn't. And the fact that Mr. Berger wants to only possess it in his house as opposed to walking outside with it and terrifying people with it is irrelevant. The Supreme Court has defined the Second Amendment as not reaching these types of weapons. And that's why Palmetto State is still good law. We take the guidance of the Supreme Court. The Supreme Court says exclude those weapons in common use, exclude the weapons that are unusual and dangerous. So it's still the precedent of this court that a machine gun is unusual and dangerous. I think the words that this court used in Palmetto State is exceedingly dangerous, which is fairly indisputable. And that's why these authorities— Is there any daylight between in common use and dangerous and unusual? Perhaps. I haven't thought that through, and we could stand here and try to think of examples. All the examples that are cited in the case law and that have been the focus of litigation, there has not been daylight. The machine gun is the type of weapon that was not in common use, something that could cause that kind of harm. And certainly it's unusual and dangerous, as this court has defined. I want to point out that the Sixth Circuit had a non-presidential case last week. I saw this when I was getting up to speed yesterday, and I texted my friend, Ms. Lynn, so she would know about it. But United States v. Greeley was decided by the Sixth Circuit on June 30th. It's G-R-E-E-L-Y 2025 Westlaw 1797223. It's the exact same situation where a person is challenging his conviction under the Second Amendment for possession of a machine gun. Not only do we have Heller and Bruin, but the Sixth Circuit has exactly the pre-Bruin precedent that this court has in Palmetto State. It's called Hamblin and the Sixth Circuit from 2009. The Sixth Circuit didn't even write a presidential opinion. It just said, this is settled. And I would submit that the same is true here, though, of course, I'm not suggesting there shouldn't be a presidential opinion. If I understand your argument correctly, Mr. Zausman, you're saying all we need to do is look at Miller. Miller's still good law. Sawed-off shotguns were new or prohibited. Machine gun has to be prohibited. Right. Miller's still good law. Heller's still good law. Heller was emphatic in preserving the basic point of Miller, which is that unusual and dangerous weapons are not protected by the Second Amendment. Unless the court has further questions. Thank you. Is Miller still good law? I think the reasoning of Miller is now in question, given that Heller went to such extent to divorce the right protected by the Second Amendment from militia service. Miller was very much about saying Second Amendment rights is associated with the need to serve in militia and this collective self-defense concept. Heller went out of its way to say Second Amendment is about an individual right to self-defense, including in the home, which Bruin recognized that there is an even greater interest in the home for self-defense than in the public. Nobody has come out, the Supreme Court has not come out to flat out overrule Miller. But Justice Scalia certainly went out of his way to talk about why Miller can still be consistent with what Heller said. In both of those cases, neither case dealt with machine guns. Sawed-off shotguns in one, not a full ban, just a registration and taxation requirement, unlike the ban on machine guns here. And Heller was about handguns, and specifically they said we are not conducting an exhaustive historical analysis here. If I could touch briefly on the Sixth Circuit case, Greeley, Mr. Zelzmer did tell me about it. I am very grateful for the heads up from him. It is a non-precedential opinion. The Sixth Circuit also heard oral argument in a case called U.S. v. Bridges. The case number in the Sixth Circuit is 24-5874. That oral argument was on May 7th of 2025. And one issue that kept coming up over and over again during that oral argument is whether or not there is any precedent, any historical example, of a full ban on a whole class of weapons. And whether or not a full ban on a whole class of weapons in one's home, the mere possession of it, could be justified under this nation's historical tradition. I urge this Court to be clear, to engage in the strict application of Bruin, and clearly state whether or not the concept of common use belongs in Step 1 or not of Bruin. I feel like if this Court, or I worry that if this Court were simply to say Palmetto State controls, then we will never have clarity on where common use belongs. We'll never have clarity as to whether or not the plain text staff of Bruin is truly a plain text staff, or if we are going to be collapsing in some way, shape, or form the historical analysis that Bruin seems to state belongs in Step 2. This Court's reasoning in Range 2 supports the idea that common use is in Step 2, only text is in Step 1. This Court in Range cautioned all of us against over-reading dicta that appears in Heller. Range talked about how if we engage in this idea of reading law-abiding and responsible citizens, and the definition of the word people, then we fall into the trap of using a vague standard. What does responsible mean? We fall into the trap of engaging in a circular analysis and allowing legislators to control what law-abiding means, which is not the purpose of the Second Amendment. Second Amendment puts the stop on legislators, not the other way around. The reasoning of Range is exactly why in this Court, the Court should not find that common use has any place in defining what the word arms means in the Second Amendment. That that common use really should be considered a corollary of dangerous and unusual and belongs in the second step of the historical tradition analysis. One last thing. Mr. Zolzmer does talk about how there's no factual dispute that three of the silencers were imported from China. Respectfully, I do disagree. The silencers, quote-unquote silencers, were actually sold as solvent traps. There are solvent traps out there that are easily convertible into silencers with the drilling of one or two holes. And these solvent traps happen to have an X mark where the hole should be drilled. But nonetheless, they weren't full and completed manufactured silencers. Something else had to be done to them before they could be used as silencers. And they were labeled solvent traps, not silencers. It wasn't a factual dispute before the district court because the government had not produced any historical analogs that would make that distinction relevant in the analysis before the district court. So I do still think that it is more appropriate for this court to remand on the question of silencers to the district court to actually conduct the step two analysis in the first instance. Thank you. Thank you. Thank all counsel for your arguments and your briefs. We'll take this matter under advisement. Have a good day.